UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
WORCESTER DIVISION

| | |
|---|---|
| JOHN HEATON and CHRISTOPHER HORIGAN on behalf of themselves and others similarly situated,<br><br>   Plaintiff,<br><br>v.<br><br>MOTOR VEHICLE ASSURANCE, NATIONAL AUTO PROTECTION CORP., and SUNPATH, LTD.<br><br>   Defendants. | Case No. 4:17-cv-40169-TSH |

**PLAINTIFF'S MOTION FOR FINAL APPROVAL OF CLASS
ACTION SETTLEMENT AND INCORPORATED MEMORANDUM IN SUPPORT**

**INTRODUCTION**

John Heaton ("Plaintiff"), along with the defendant, Motor Vehicle Assurance ("Defendant" and with Plaintiff referred to as "the Parties"), have reached a class action settlement of this matter (the "Settlement") and now petition this court for final approval. The Settlement includes the establishment of a $419,000 Settlement Fund to be distributed to Settlement Class Members who file a valid claim after payment of notice and administration costs, Plaintiff's Counsel fees, and an incentive award to the Plaintiff.[1] There is no reverter to the Defendant of any portion of the Settlement Fund. The Settlement was reached by counsel with a keen understanding of the merits of the claim and extensive experience in actions brought under the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227. The relief provided meets the applicable standards of fairness when taking into consideration the nature of Plaintiff's

---

[1] All capitalized terms not defined herein have the meanings set forth in the Parties' Class Action Settlement Agreement ("Settlement" or "Agreement"). *See* ECF No. 107-1.

claims and the risks inherent in class litigation. Particularly relevant in this case, in addition to providing monetary relief to the class, the Defendant has agreed to take remedial steps to ensure its telemarketing going forward is TCPA compliant. In addition, the Defendant is without financial means to provide full relief to the class and would be bankrupted if this case were to proceed to a trial resulting in a full judgment, or anything approaching it, in Plaintiff's favor.

Pursuant to the Court-approved notice plan, direct individual notice of the Settlement was sent to the Settlement Class. The reaction of the class to this settlement has been overwhelmingly positive. Most importantly, despite the fact that about 95% the members of the class received *direct, personal notice by U.S. Mail* (not mere "publication" notice, as sometimes occurs in class action settlements), *no class members* objected. 442 class members took the time to file a claim and those who have done so stand to receive approximately $500.00 each. Following direct notice under CAFA to each state attorney general's office, no state attorney general, nor the Attorney General of the United States, has objected. In summary:

| | |
|---|---|
| Notice Reach: | 94.9% |
| Claims Received: | 442 out of 7,441 |
| Claims Rate: | 5.9% |
| Objections: | 0 |
| Exclusions: | 2 |
| Estimated Recovery: | $509.45 |

The Settlement is an excellent result for the Class, particularly in view of the risks and delays involved in continued litigation. Considering the overwhelmingly favorable support for the Settlement from the class members, Plaintiff respectfully requests that this Court finally approve the Settlement in its entirety.

A.  **NATURE AND BACKGROUND OF THE CASE**

This case rests on alleged violations of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227, which prohibits, *inter alia*, initiating any telephone solicitation to a cell phone using an ATDS or an artificial or prerecorded voice. *See* 47 U.S.C. § 227(b). The TCPA also makes it unlawful to receive more than one telephone call within any twelve-month period by or on behalf of the same entity after placing your number on the National Do Not Call Registry. *See* 47 U.S.C. § 227(c)(5). The TCPA provides a private cause of action to persons who receive such calls. *Id.*

Plaintiff is an individual residing in Massachusetts whose cellular telephone number has been called with unsolicited messages for years. On December 18, 2017, Plaintiff filed a putative class action lawsuit against Defendant. Since that time, the Parties engaged in discovery and other litigation relating to class certification and other issues. During discovery, the parties exchanged documents relating to the dialing system used to make the calls to putative class members, the relationship between the Defendant and its telemarketing vendor, as well as the targets of the telemarketing campaigns.

Near the conclusion of discovery, the parties began settlement discussions which eventually culminated in the Settlement Agreement

B.  **THE PROPOSED SETTLEMENT**

   1.  **Structure of the Settlement**

Pursuant to the Settlement Agreement, Plaintiff seeks certification of the following Settlement Class for settlement purposes only:

> Plaintiff and all called persons by Settling Defendant (or on its behalf) that were sold a Sunpath, Ltd. product at any time between December 18, 2013 to September 30, 2019 that were called on a cellular telephone or while they were on the National Do Not Call Registry for at least 30 days.

(Agreement ¶ 2.0). The proposed Settlement encompasses 7,835 individuals. The proposed Settlement establishes a non-reversionary $419,000.00 Settlement Fund, which will exclusively be used to pay: (1) cash settlement awards to Settlement Class Members; (2) Settlement Administration Expenses; (3) attorney's fees of one-third of the total amount of the Settlement Fund in addition to out of pocket expenses, subject to Court approval; and (4) a court-approved incentive award to the Class Representative of up to $5,000. Each Settlement Class Member who submits a valid claim shall be entitled to receive an equal *pro rata* amount of the Settlement Fund after all settlement administrative expenses, incentive awards, and fee awards are paid out of the Settlement Fund. In addition, the Defendant has agreed to take remedial steps to ensure its telemarketing going forward is TCPA compliant.

    **2.**    **Claims Administration**

On February 4, 2020, this Court granted preliminary approval to the settlement. Dkt. No. 113. As part of the Court's order, at the parties' recommendation, and after a competitive bidding process, the nationally recognized class action administration firm KCC was appointed as Settlement Administrator to give notice to the Settlement Class. The Settlement Class, in turn, consists of 7,835. Pursuant to the notice plan, KCC mailed 7,835 Notice Packets to Settlement Class Members. *See* Exhibit 1, Declaration of Meagan Brunner at ¶ 8. Of those mailed, 483 notices were returned as undeliverable, and through a search of various publicly available sources, KCC was able to re-mail 89 of those notices to the best available forwarding address. *Id.* at ¶ 9. As a result, approximately 95% of the mailed notices have, as best as the parties can determine, reached class members. *Id.* Such a percentage far exceeds established due process requirements for class notice. *See* Federal Judicial Center, Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide (2010), *available at* https://goo.gl/KTo1gB

(instructing that notice should have an effective "reach" to its target audience of 70-95%); *see also Swift v. Direct Buy, Inc.*, No. 2:11-cv-401-TLS, 2013 WL 5770633, at *3 (N.D. Ind. Oct. 24, 2013) ("The Federal Judicial Center's checklist on class notice instructs that class notice should strive to reach between 70% and 95% of the class."). In addition to the direct mailed notice, KCC also established a website, www.MVATCPASettlement.com, by which potential class members could view settlement documents and make claims. *See* Exhibit 1, at ¶ 10.  KCC also established a toll-free telephone number through which potential class members could receive additional information about the settlement. *Id.* at ¶ 11. Finally, KCC provided notice to relevant governmental entities pursuant to the Class Action Fairness Act ("CAFA").  No class members or government entities have voiced any disagreement with any aspect of the settlement. *Id.* at ¶ 4.

### 3. Response of the Class.

Pursuant to the Court's preliminary approval order, class members had until May 4, 2020, to submit a claim under the settlement.  Dkt. No. 113.  KCC received 442 valid claims by the postmark deadline. *See* Exhibit 1 at ¶ 12. This represents a combined claims rate of approximately 5.9% exceeds a number of other TCPA settlements. *Compare Cross v. Wells Fargo Bank, N.A.,* Case No. 1:15-cv-01270, Dkt. No. 86-1 (N.D. Ga.) (settlement approved with a claims rate of 6.7%)); *Bayat v. Bank of the West,* No. C-13-2376 EMC, 2015 WL 1744342, at *5 (N.D. Cal. Apr. 15, 2015) (claims rate of 1.9% for monetary portion of settlement, and 1.1% for injunctive relief portion of settlement); *Wilkins v. HSBC Bank Nevada, N.A.*, No. 14-190, 2015 WL 890566, at *3 (N.D. Ill. Feb. 27, 2015) ("3.16% of the class[] filed a timely claim"); *Kolinek v. Walgreen Co.,* 311 F.R.D. 483, 493 (N.D. Ill. 2015) (approving TCPA class action settlement with 2.5% claims rate); *Michel v. WM Healthcare Solutions, Inc.,* No. 1:10-CV-638, 2014 WL 497031, at *4 (S.D. Ohio Feb. 7, 2014) ("a total response rate of 3.6%"); *Arthur v.*

*SLM Corp.,* No. C10–0198 JLR, Docket No. 249 at 2–3 (W.D. Wash. Aug. 8, 2012) (claims rate of approximately 2%); *Grannan v. Alliant Law Grp.*, P.C., No. C10-02803 HRL, 2012 WL 216522, at *3 (N.D. Cal. Jan. 24, 2012) (claims rate under 3%).

### C. THE SETTLEMENT MEETS ALL REQUIREMENTS FOR FINAL APPROVAL

Under Fed. R. Civ. P. 23(e), a class action settlement agreement requires the court's approval. "A district court can approve a class action settlement only if it is fair, adequate and reasonable." *City P'shp. Co. v. Atlantic Acquisition*, 100 F.3d 1041, 1043 (1st Cir. 1996), *quoting, Durrett v. Housing Auth. of City of Providence*, 896 F.2d 600, 604 (1st Cir. 1990).

In considering final approval of a class action settlement, Courts in the First Circuit consider the following list of factors in deciding whether to approve a settlement; (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining a class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation. *New England Carpenters Health Benefits Fund v. First Databank, Inc.,* 602 F. Supp. 2d 277, 281 (D. Mass. 2009); *In re Lupron Marketing And Sales Practices Litigation,* 228 F.R.D. 75, 93 (D. Mass. 2005), *cited with approval in*, *In re Relafen Antitrust Litigation,* 231 F.R.D. 52, 72 (D. Mass. 2005). Similarly, Rule 23, as revised as of December 1, 2018, sets forth a list of overlapping points a court must consider in determining whether a proposed class action settlement is fair, reasonable, and adequate." *Snyder*, 2019 U.S. Dist. LEXIS 80926, at * 14. These are:

>    (A) the class representatives and class counsel have adequately represented the class; (B) the proposal was negotiated at arm's length; (C) the relief provided for the class is adequate, taking into account: (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3); and (D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2). Those factors are satisfied here.

### 1. The Class Representatives and Class Counsel Have Adequately Represented the Class.

In a class settlement context, a "presumption of fairness, adequacy, and reasonableness may attach to a class settlement reached in arm's-length negotiations between experienced, capable counsel after meaningful discovery." *Am. Int'l Grp., Inc. v. ACE INA Holdings, Inc.*, Nos. 07-CV-2898, 09-CV- 2026, 2012 U.S. Dist. LEXIS 25265, at * 39 (N.D. Ill. Feb. 28, 2012) (quoting *Wal-Mart Stores, Inc. v. Visa USA, Inc.*, 396 F.3d 96, 116 (2d Cir. 2005). Previously, counsel for the class have submitted to the Court for its review their qualifications and a detailed disclosure of the course of this litigation through to final approval. In light of this history, counsel for the Plaintiff had a complete picture of the case, and did everything possible to get the best possible result for class members. On the basis of these efforts, the case was highly developed by class counsel is experienced, competent, qualified and able to conduct the litigation vigorously. Plaintiff and his counsel believe that the Settlement is fair, reasonable, and adequate, and in the best interests of the members of the class. Plaintiff also believes that the benefits of the parties' settlement far outweigh the delay and considerable risk of proceeding to a contested class certification and trial.

### 2. The Settlement Was Negotiated at Arm's-Length, and There Has Been No Fraud or Collusion.

"A settlement reached after a supervised mediation receives a presumption of reasonableness and the absence of collusion." 2 McLaughlin on Class Actions, § 6:7 (8th ed. 2011). Here, the Settlement Agreement resulted from good faith, arm's-length settlement negotiations over many months. Accordingly, the parties negotiated their settlement at arm's-length, and absent any fraud or collusion.

### 3. The Settlement Provides Substantial Relief for the Class

Rule 23(e)(2)(C) and (D) direct the Court to evaluate whether "the relief provided for the class is adequate" and "the proposal treats class members equitably relative to each other." The relief this Settlement provides meaningful and substantial relief, particularly given the facts and circumstances of this case. And the Settlement's terms ensure all Settlement Class Members will be treated equitably.

### 4. Diverse and Substantial Legal and Factual Risks Weigh in Favor of Settlement.

The expense, complexity and duration of litigation are significant factors considered in evaluating the reasonableness of a settlement. Here, litigating the case through trial would undoubtedly be time-consuming and expensive. As with most class actions, this case is complex. Absent settlement, litigation could likely continue for years before the class would see any recovery. That a settlement would eliminate the delay and expenses strongly militates in favor of approval. *See Milstein v. Huck*, 600 F. Supp. 254, 267 (E.D.N.Y. 1984). Although Plaintiff here believes that he would ultimately prevail on the merits at trial, success is far from assured. If approved, the Settlement would bring a sure end to what would be contentious and costly litigation with substantial risk. One of those risks focuses on the question of whether Motor Vehicle Assurance's dialing system, which Plaintiff contends is a predictive dialer, is an

"Automatic Telephone Dialing System" under the TCPA. As an initial matter, on July 10, 2015, the FCC released an omnibus declaratory ruling clarifying numerous relevant issues affecting the TCPA, including definition of an ATDS under the statute[2]—which was recently overturned in part in *ACA Int'l v. FCC*, 885 F.3d 687 (D.C. Cir. 2018). Following the D.C. Circuit's decision in *ACA Int'l* courts have been split on what constitutes an ATDS under the TCPA.

There is a substantial amount of cases finding predictive dialers not to be ATDS. For example, in *Pinkus v. Sirius XM Radio, Inc.*, No. 16 C 10858, 2018 U.S. Dist. LEXIS 125043 (N.D. Ill. July 26, 2018) the Court held that an ATDS must generate random numbers to be called:

> As relevant here, the TCPA prohibits "mak[ing] any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any [ATDS] ... to any telephone number assigned to a ... cellular telephone service ... ." 47 U.S.C. § 227(b)(1)(A)(iii). The TCPA defines an ATDS as "equipment which has the capacity—(A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." *Id…*
>
> *ACA International* did not itself articulate a definitive view of which functions characterize an ATDS. *See* 885 F.3d at 703 (noting that "[i]t might be permissible" for the FCC to conclude *either* that a device can "qualify as an ATDS only if it can generate random or sequential numbers to be dialed" *or* that it can "so qualify even if lacks that capacity"). Given this, the parties' dispute can be reduced to the question whether a predictive dialing device that calls telephone numbers from a stored list of numbers—rather than having generated those numbers either randomly or sequentially—satisfies [*25] the statutory definition of ATDS.
>
> So, the phrase "using a random or sequential number generator" necessarily conveys that an ATDS must have the capacity to generate telephone phone numbers, either randomly or sequentially, and then to dial those numbers. *See Dominguez v. Yahoo, Inc.*, 629 F. App'x 369, 372 (3d Cir. 2015) (holding that "'random or sequential' number generation ... refers to the numbers themselves rather than the manner in which they are dialed"). This interpretation finds support in the FCC's pre-2003 understanding of the statutory term ATDS. The 1992 Order expressed the view that "[t]he prohibitions of § 227(b)(1)"—which, as noted, make it unlawful to use an ATDS under certain conditions—"clearly do not apply to

---

[2] *See* https://apps.fcc.gov/edocs_public/attachmatch/FCC-15-72A1.pdf.

- 9 -

> functions like 'speed dialing,' 'call forwarding,' or public telephone delayed message services (PTDMS), because the numbers called are not generated in a random or sequential fashion." 7 FCC Rcd. 8752, 8776 ¶ 47. And in a follow-on 1995 ruling, the Commission described "calls dialed to numbers generated randomly or in sequence" as "autodialed." *In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 10 FCC Rcd. 12391, 12400 ¶ 19 (1995). The FCC's pre-2003 understanding of § FCC(a)(1) thus reinforces what its plain text shows—that equipment qualifies as an ATDS only if it has the capacity to function ... by generating random or sequential telephone numbers and dialing those numbers.

*Pinkus* at *4, 29-31 (N.D. Ill. July 26, 2018). The Third Circuit Court of Appeals adopted a similar stance in *Dominguez v. Yahoo, Inc.*:

> The decision in *ACA International* has narrowed the scope of this appeal. In light of the D.C. Circuit's holding, we interpret the statutory definition of an autodialer as we did prior to the issuance of 2015 Declaratory Ruling. Dominguez can no longer rely on his argument that the Email SMS Service had the latent or potential capacity to function as autodialer. The only remaining question, then, is whether Dominguez provided evidence to show that the Email SMS Service had the present capacity to function [**6] as [an] autodialer…

> Ultimately, Dominguez cannot point to any evidence that creates a genuine dispute of fact as to whether the Email SMS Service had the present capacity to function as an autodialer by generating random or sequential telephone numbers and dialing those numbers. On the contrary, the record indicates that the Email SMS Service sent messages only to numbers that had been individually and manually inputted into its system by a user. There can be little doubt that Dominguez suffered great annoyance as a result of the unwanted text messages. But those messages were sent precisely because the prior owner of Dominguez's telephone number had affirmatively opted to receive them, not because of random number generation. The TCPA's prohibition on autodialers is therefore not the proper means of redress.

*Dominguez v. Yahoo, Inc.*, 894 F.3d 116, 119, 121 (3d Cir. 2018).

If this Court were to agree with the Court in *Pinkus* or if the First Circuit Court of Appeals were to adopt the approach of the Third Circuit Court of Appeals, no one, including the Plaintiff, would have been able to recover *anything at all*. Other courts have adopted the same position as Judge Feinerman and Third Circuit Court of Appeals. *See e.g. Glasser, v. Hilton Grand Vacations Company, LLC*, No. 8:16-CV-952-JDW-AAS, 2018 WL 4565751 (M.D. Fla.

Sept. 24, 2018)*; Marshall v. CBE Group, Inc.*, Case No. 2:16-cv-02046-GMN, 2018 WL 1567852 (D. Nev. Mar. 30, 2018); *Herrick v. GoDaddy.com LLC*, No. CV-16-00254-PHX-DJH, 2018 WL 2229131 (D. Ariz. May 14, 2018); *Gary v. TrueBlue, Inc.*, Case No. 17-cv-10544, 2018 WL 3647046 (E.D. Mich. Aug. 1, 2018); *Keyes v. Ocwen Loan Servicing*, No. 17-cv-11492, 2018 U.S. Dist. LEXIS 138445, at *15 (E.D. Mich. Aug. 16, 2018).

Class certification is also far from automatic in TCPA cases. *Compare Tomeo v. CitiGroup, Inc.*, No. 13 C 4046, 2018 WL 4627386, at *1 (N.D. Ill. Sept. 27, 2018) (denying class certification in TCPA case after nearly five years of hard-fought discovery and litigation); *Jamison v. First Credit Servs.*, 290 F.R.D. 92, 107 (N.D. Ill. 2013) (finding issues of consent to predominate in TCPA action) and *Balschmiter v. TD Auto Fin. LLC*, 303 F.R.D. 508, 527 (E.D. Wis. 2014) (same), with *Saf-T-Gard Int'l v. Vanguard Energy Servs.*, No. 12-3671, 2012 WL 6106714 (N.D. Ill. Dec. 6, 2012) (certifying a class in a TCPA action and finding no evidence supported the view that issues of consent would be individualized) and *Birchmeier v. Caribbean Cruise Line, Inc.*, 302 F.R.D. 240, 253 (N.D. Ill. 2014) (same).

In addition, at least some courts view awards of aggregate, statutory damages with skepticism and reduce such awards — even after a plaintiff has prevailed on the merits — on due process grounds. *See, e.g., Aliano v. Joe Caputo & Sons – Algonquin, Inc.*, No. 09-910, 2011 WL 1706061, at *4 (N.D. Ill. May 5, 2011) ("[T]he Court cannot fathom how the minimum statutory damages award for willful FACTA violations in this case — between $100 and $1,000 per violation — would not violate Defendant's due process rights …. Such an award, although authorized by statute, would be shocking, grossly excessive, and punitive in nature."); *but see Phillips Randolph Enters., LLC v. Rice Fields*, No. 06-4968, 2007 WL 129052, at *3 (N.D. Ill. Jan. 11, 2007) ("Contrary to [defendant's] implicit position, the Due Process clause of the 5th

- 11 -

Amendment does not impose upon Congress an obligation to make illegal behavior affordable, particularly for multiple violations.").

Moreover, the narrative of the Defendant's telemarketing compliance efforts could present a case for reduction of any damages awarded after trial and some courts have applied this principle in the TCPA context. For example, the Court explained in *Golan v. Veritas Entm't, LLC* before reducing the damages awarded in that TCPA class action lawsuit to $10 a call:

> Three courts have reduced damages awards in TCPA cases. In *Texas v. American Blastfax, Incorporated*, plaintiff, the state of Texas, brought suit against defendants, American Blastfax, Incorporated and two of its officers and directors. 164 F.Supp.2d 892, 894 (W.D. Tex. 2001). The district court held defendant Blastfax had violated the TCPA by sending unsolicited intrastate fax advertisements. *Id.* at 894. Defendants presented evidence the average cost of receiving an unwanted fax is seven cents per page. *Id.* at 900. Although it stated the TCPA provides for liquidated damages of $500 for each violation, the district court found it would be inequitable and unreasonable to award that amount for each violation. *Id.* Instead, the district court interpreted the provision as providing for "up to" $500 per violation. *Id.* The district court found a reasonable award was seven cents per violation, which it trebled because defendants' conduct was willful and knowing, for a total amount of $495,375…
>
> The next case which reduced damages for TCPA violations is *Maryland v. Universal Elections, Incorporated*, 862 F.Supp.2d 457 (D. Md. 2012). The state of Maryland brought a civil enforcement action against Universal Actions, Incorporated and two individuals, alleging defendants violated the TCPA by making 112,000 prerecorded telephone calls to residents on Election Day. *Id.* at 459. The district court found defendants violated the TCPA. *Id.* at 463-464. The base damages award could have been $34,000,000 and could have exceeded one hundred million dollars if trebled, because the violations were knowing. *Id.* at 464. The state of Maryland requested $10,424,550. *Id.* at 465. The district court awarded $1,000,000. *Id.* at 466. The district court reasoned "a $10 million penalty is disproportionate to the size of the company and the defendants' presumptive ability to pay." *Id.*
>
> The third case is *United States v. Dish Network, LLC*, No. 09-3073, 256 F. Supp. 3d 810, 2017 U.S. Dist. LEXIS 85543, 2017 WL 2427297 (C.D. Ill. Jun. 5, 2017). Plaintiffs, the United States and the States of California, Illinois, North Carolina, and Ohio, alleged defendant, Dish Network, LLC, violated the TCPA, as well as several state laws and regulations, by placing telephone calls to telephone numbers on the do-not-call list. 2017 U.S. Dist. LEXIS 85543, [WL]at *1. After a bench trial, the Central District of Illinois entered judgment in favor of the plaintiffs and

against the defendant. *Id.* Plaintiffs asked for a damages award of $2.1 billion. 2017 U.S. Dist. LEXIS 85543, [WL] at *139. The district court awarded civil penalties and statutory damages of $280,000,000, approximately 20 percent of the defendant's after-tax profits for 2016, finding this amount was "appropriate and constitutionally proportionate, reasonable, and consistent with due process." *Id.* The district court further reasoned "[t]he amount represents a significant penalty for the millions and millions of Do-Not-Call violations caused by Dish over years and years of careless and reckless conduct." *Id.* Finally, the district court stated "[t]he injury to consumers, the disregard for the law, and the steadfast refusal to accept responsibility require a significant and substantial monetary award."

*Golan v. Veritas Entm't, LLC*, No. 4:14CV00069 ERW, 2017 U.S. Dist. LEXIS 144501, at *6-9 (E.D. Mo. Sep. 7, 2017).

Aside from the litigation risks, Defendant made clear that it was a relatively small marketing company without the financial means to pay a full judgment had this matter proceeded to trial and through appeal with a result favorable to the Plaintiff. The financial condition of a Defendant is an important factor in evaluating the fairness of a proposed settlement. *See e.g. Krimes v. JPMorgan Chase Bank, N.A.*, No. 15-5087, 2017 U.S. Dist. LEXIS 79434 * 23-25 (E.D. Pa. May 24, 2017) (recognizing financial inability of defendant to pay a larger judgment as a relevant factor for consideration on preliminary approval of a class action settlement).

By reaching this Settlement, the parties will avoid protracted litigation and will establish a means for prompt resolution of Class Members' claims against Defendant. These avenues of relief provide a benefit to Class Members. In addition, however, Defendant has agreed to take remedial measures to ensure that its telemarketing is TCPA compliant going forward. Given the alternative of long and complex litigation before this Court, the risks involved in such litigation, the Defendant's financial position, and the possibility of further appellate litigation, the availability of prompt relief under the Settlement is highly beneficial to the Class.

By reaching this Settlement, the parties will avoid protracted litigation and will establish a means for prompt resolution of Class Members' claims against Defendant. These avenues of

relief provide a benefit to Class Members. In addition, however, Defendant has agreed to take remedial measures to ensure that its telemarketing is TCPA compliant going forward. Given the alternative of long and complex litigation before this Court, the risks involved in such litigation, the Defendant's financial position, and the possibility of further appellate litigation, the availability of prompt relief under the Settlement is highly beneficial to the Class.

Plaintiff believed, and continues to believe, in the strength of the claims asserted in this case.  But her likelihood of success on class certification, summary judgment, and at trial was far from certain. Accordingly, Plaintiff's decision to settle his claims, and the claims of the members of the class, was reasonable.

### 5. The Monetary Terms of this Proposed Settlement Fall Favorably within the Range of Prior TCPA Class Action Settlements.

The Settlement requires Defendant to pay $419,000 into a Settlement Fund. Class Members who submitted a valid claim will receive $509.45, an amount that exceeds comparable settlements.[3] The Settlement provides substantial relief to Class Members without delay, particularly in light of the above risks that Class Members would face in litigation.

### 6. The Settlement is an Effective and Equitable Means of Distributing Relief to the Settlement Class.

The Settlement treats each class member in precisely the same way. *See* Fed. R. Civ. P. 23(e)(2)(C) & (D) advisory committee's note (identifying, among potential "[m]atters of concern," whether "the scope of the release may affect class members in different ways that bear on the apportionment of relief"). Every class member who made a claim will receive the exact

---

[3] *See, e.g.*, *In re Capital One TCPA Litig.*, 80 F. Supp. 3d at 789 (granting final approval where each class member would be awarded $39.66); *Kolinek*, 311 F.R.D at 493–94 (granting final approval where class members each stood to receive $30).

same relief, in return for the exact same release as to Defendant. No one was favored, disfavored, or otherwise treated differently from anyone else. Moreover, the overwhelmingly positive reaction of class members to the Settlement and its relief supports the fundamental equality and effectiveness of the Settlement.  As a result of the notice that KCC distributed, 655 members of the Class submitted valid claims, and no class member objected to the Settlement. This overwhelmingly favorable reaction to the Settlement supports its final approval. *See Chun-Hoon v. McKee Foods Corp.*, 716 F. Supp. 2d 848, 852 (N.D. Cal. 2010) ("The reaction of class members to the proposed settlement, or perhaps more accurately the absence of a negative reaction, strongly supports settlement."); *Perez v. Asurion Corp.*, 501 F. Supp. 2d 1360, 1381 (S.D. Fla. 2007) ("A low percentage of objections demonstrates the reasonableness of a settlement."); *Nat'l Rural Telecomms. Coop. v. DIRECTV Inc.*, 221 F.R.D. 523, 529 (C.D. Cal. 2004) ("the absence of a large number of objections to a proposed class action settlement raises a strong presumption that the terms of a proposed class settlement action are favorable to the class members"); *Brotherton v. Cleveland*, 141 F. Supp. 894, 906 (S.D. Ohio 2001) ("[A] relatively small number of class members who object is an indication of a settlement's fairness."); *In re Austrian & German Bank Holocaust Litig.*, 80 F. Supp. 2d 164, 175 (S.D.N.Y. 2000) ("If only a small number of objections are received, that fact can be viewed as indicative of the adequacy of the settlement.").

      **D.**      **THE FORMS AND MANNER OF NOTICE COMPLIED WITH RULE 23 AND DUE PROCESS**

Notice is adequate if it is "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 174 (1974), *quoting, Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950*); In re*

*Compact Disc Litig.*, 216 F.R.D. 197, 203-04 (D. Me. 2003) (notice satisfied Rule 23 because it provided sufficient information for class members to decide whether to file claims, opt out, seek exclusion or object); *Greenspun v. Bogan*, 492 F.2d 375, 382 (D. Mass. 1974) (essential purpose of notice is to apprise class members of settlement terms and class members' options). Sending notice by first class mail to class members identifiable by reasonable means is regularly deemed adequate under Rule 23(c)(2).  *Reppert v. Marvin Lumber & Cedar Co., Inc.*, 359 F.3d 53, 56-57 (1st Cir. 2004).

In this case, direct mail notice was successfully delivered to over 7,440 class members of class members- or approximately 95% of the class. *See* Exhibit 1 at ¶1. Moreover, KCC set up an administered a settlement website, which contained all relevant documents and notice forms to any class members who researched the website. *Id.* at ¶11. *See,, e.g.*, *Edwards v. N. Am. Power & Gas, LLC*, 2018 WL 3715273, at *5 (D. Conn. Aug. 3, 2018) (approving notice by postcard directing class members to website). In sum, the notice program in this case far exceeds the minimum due process requirements.

## CONCLUSION

Plaintiff respectfully submits that the settlement in this matter is an excellent result for class members, and the response from class members suggests that they agree. Those class members who took the time to file a claim will receive over $350.00, an amount in excess of many comparable settlements. Plaintiff respectfully requests that the Court approve this unopposed request to approve the settlement and enter a final judgment and order, which is attached as Exhibit 2.

Respectfully submitted,

*/s/ Anthony I. Paronich*
Anthony I. Paronich
Paronich Law, P.C.
350 Lincoln Street, Suite 2400
Hingham, MA 02043
(508) 221-1510
anthony@paronichlaw.com

Alex M. Washkowitz
Jeremy Cohen
CW Law Group, P.C.
188 Oaks Road
Framingham, MA 01701
alex@cwlawgrouppc.com

*Attorneys for Plaintiffs and the Proposed Class*

## CERTIFICATE OF SERVICE

I hereby certify that on May 26, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification to all counsel of record.

*/s/ Anthony I. Paronich*
Anthony I. Paronich